UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★   MAR 2 4 2016   ★

BROOKLYN OFFICE

-------------------------------------------------------------- X
                                                              :
**ANTHONY DINAPOLI,**                                         :
                                    Plaintiff,                :
                                                              :   **MEMORANDUM DECISION AND**
                                                              :             **ORDER**
                                                              :
                - against -                                   :
                                                              :   14 Civ. 3652 (AMD)
                                                              :
**COMMISSIONER OF SOCIAL SECURITY,**                          :
                                                              :
                                   Defendant.                 :
-------------------------------------------------------------- X

**ANN DONNELLY,** District Judge.

Anthony Dinapoli challenges the Social Security Commissioner's determination, after a hearing before an Administrative Law Judge ("ALJ"), that he is not disabled for purposes of receiving disability insurance benefits under the Social Security Act. The case is before me on the parties' cross-motions for judgment on the pleadings pursuant to Federal Rules of Civil Procedure 12(c). For the reasons explained below, the Commissioner's motion is denied, and the plaintiff's motion is granted in part and denied in part. The case is remanded to the Commissioner for further proceedings consistent with this opinion.

## BACKGROUND

### I.   Procedural History

The plaintiff applied for Social Security disability insurance benefits on August 30, 2011, alleging disability since March 1, 2011 due to spinal disease, a right elbow injury, left shoulder injury, depression, and anxiety. (Tr. 122-127.)[1] After his application was denied on October 21,

---

[1] "Tr." references are to the certified administrative record.

2011 (Tr. 54-65), the plaintiff requested a hearing (Tr. 66-67), which was held before Administrative Law Judge ("ALJ") Hilton R. Miller on March 5, 2013. (Tr. 28-43.)[2] ALJ Miller conducted a *de novo* review and denied the plaintiff's claim, finding that given the plaintiff's age, education, work experience, and residual functional capacity, he could successfully adjust to other work. (Tr. 10-22.) The Appeals Council denied the Plaintiff's request for review, (Tr. 1-3), and this appeal followed.

## II. Non-Medical Evidence

### a. The Evidence at the Hearing

The plaintiff, a high school graduate, was born on April 18, 1961. (Tr. 137, 141, 153.) The plaintiff had suffered from back problems for a "very long time;" he had surgery on his lower back in 1993, and a 2008 car accident re-activated those problems. (Tr. 33.) He retired from his job with the Sanitation Department in October of 2010, having worked there for twenty years, because he could no longer perform the physical aspects of the job. (Tr. 31, 33.) During his last year of work at the Sanitation Department, he missed about 25 days each month because of his back pain. (Tr. 34.) The plaintiff chose to stay on at the Sanitation Department rather than apply for disability in order to get his pension. (*Id*.) In addition to the sanitation job, he worked sporadically at a tile company; his brother-in-law was the foreperson at the company, and gave the plaintiff special treatment. The plaintiff had not been able to work since October 2011. (Tr. 33-35.)

The plaintiff had injuries to his spine, right elbow, and left shoulder, suffered from severe migraines, and was "always in pain and very uncomfortable." (Tr. 36, 167.) The pain made it

---

[2] At the hearing, the plaintiff, through his counsel, amended his alleged date of onset to April 18, 2011.

difficult for him to lift things and to bend over, and he could no longer stand, walk, or sit comfortably for a long period of time. (Tr. 36, 40, 167, 171-72, 175.) He could walk for only 15 minutes at a time, and could sit for only 45 minutes at a time if his legs were elevated. (Tr. 36.) His back hurt if he lifted anything that weighed more than five to ten pounds. (*Id.*) At the time of his hearing, Dr. Idan Sharon was treating the plaintiff for his back and neck problems, using therapy and pain medication. (Tr. 36-37, 174.)

In addition to his physical injuries, the plaintiff was diagnosed with bipolar disorder and depression, for which he was being treated by Dr. Peselow at a place called Freedom from Fear. The plaintiff believed that his bipolar disorder was triggered by anger he felt about his failed marriage. (Tr. 37-38.) His bipolar disorder affected him on a daily basis; "one minute I could be laughing and the next minute, the next minute I'll be screaming at somebody for no reason." (Tr. 38.) He could not "focus on things for too long of a time," and took pills "to go to sleep because [of] a chemical imbalance where my brain is constantly thinking/functioning." (*Id.*) On the other hand, in a September, 2011 function report, the plaintiff reported that he did not have problems paying attention, could complete what he started, and could follow written and spoken instructions. (Tr. 172-73.)

The plaintiff's daily routine included watching television, walking "a little bit," and "straighten[ing] up," rather than heavy cleaning, because of his inability to bend or lift things. (Tr. 38-39, 169.) The plaintiff went outside on a daily basis. (Tr. 170.) He could drive, pay his bills, count change and handle his savings account. (*Id.*) On a social level, the plaintiff spent time with other people every day. (Tr. 171.) He reported no difficulty getting along with his family, including his fiancé and his son, who "help[ed] him out a lot." (*Id.*) While he did have

3

some problems getting along with people "in authority," he had never lost a job for that reason. (Tr. 173-74.)

In addition to the plaintiff, the ALJ heard from a vocational expert, Raymond Cestar, who had listened to the plaintiff's testimony and reviewed his records; Mr. Cestar opined that a person of the plaintiff's age, and with the same education, work experience, and residual functional capacity could work as cafeteria attendant, photocopy machine operator, and laundry folder. (Tr. 21.)[3] Mr. Cestar testified that there were 5,300 cafeteria attendant jobs in the New York City area, and 139,000 nationally; there were 4,000 photocopy jobs in the New York City area, and 66,000 nationally; and there were 7,000 laundry folder jobs in the New York City area, and 420,000 nationally. (Tr. 42.)

### b. Physical Residual Functional Capacity Assessment

A Single Decision Maker ("SDM")[4], identified only as D. Komoroff, performed a physical residual functional capacity assessment of the plaintiff on October 13, 2011. (Tr. 44-49.) Based on his examination of the plaintiff, and his review of the opinions of the plaintiff's consultative examiners and the plaintiff's MRI records, the SDM found that the plaintiff could occasionally lift and/or carry twenty pounds, could frequently lift and/or carry ten pounds, could stand and/or walk with normal breaks for a total of about six hours in an eight hour work day, could sit with normal breaks for a total of about six hours in an eight hour workday, and could do unlimited pushing or pulling. (Tr. 45, 48.) Ultimately, the SMD opined that despite the

---

[3] The ALJ stated that the vocational expert's findings comported with his review of the Dictionary of Occupational Titles. (Tr. 21.)

[4] An SDM is not a medical professional. *See Box v. Colvin,* 3 F.Supp.3d 27, 46 (E.D.N.Y. 2014); *Sears v. Astrue,* 2:11-CV-138, 2012 WL 1758843, at *6 (D.Vt. May 15, 2012) (collecting cases).

"extensive objective findings" regarding the plaintiff's physical injuries, "he retains the physical capacity to do light work." (Tr. 48.)

## III. Medical Evidence

### a. Physical Injuries

#### i. Treating Physicians

Drs. Shan Nagendra and Idan Sharon treated the plaintiff's back and lumbar, elbow, and cervical spine injuries. Dr. Nagendra started treating the plaintiff the day after his 2008 car accident, through 2010 (Tr. 273, 145), and Dr. Sharon treated him starting sometime in 2010 and at least through the March 15, 2013 hearing before ALJ Miller. (Tr. 200-354, 36-37, 174.)

**Prior to Alleged Date of Onset**

Dr. Nagendra saw the plaintiff the day after his September 28, 2008 car accident. (Tr. 273.) The plaintiff complained of headaches, neck pain that radiated to his shoulders and arms, right elbow pain, and right hand pain with numbness, but no lower back pain. (Tr. 273, 302.) Dr. Nagendra diagnosed post-traumatic headache, cervical sprain and strain, cervical radiculopathy, lumbar sprain and strain, and insomnia. (Tr. 274.) October 13, 2008 x-rays of the plaintiff's right elbow and cervical spine were normal, and x-rays of his lumbar spine showed degenerative disc disease with spondylosis. (Tr. 279-280.)

At a follow-up visit with Dr. Nagendra on October 22, 2008, the plaintiff reported severe headaches, right elbow pain, neck pain that on a scale of one to ten, rated an eight, and low back pain that radiated down both legs, and rated an eight out of ten on the pain scale. He also complained of weakness and muscle spasms in both legs. Dr. Nagendra's physical examination revealed that the plaintiff had a decreased range of motion of his cervical spine and left shoulder, tenderness of his paracervical region, upper trapezius, and right elbow, that he had muscle

spasms and tenderness in his lumbar spine, and that his straight leg raises were limited to 55 degrees to the right and 60 degrees to the left. (Tr. 270.) Dr. Nagendra diagnosed the plaintiff with cervical sprain/strain, lumbar sprain/strain, post-traumatic headache, right elbow tendonitis, and left shoulder arthropathy. (Tr. 271.) Based on these examinations, he recommended that the plaintiff take Motrin, refrain from "heavy physical activities," engage in physical and chiropractic therapy, and have MRIs of his left shoulder and cervical and lumbar spine. (Tr. 271, 274.) On October 22, 2008, Dr. Nagendra gave the plaintiff an injection of Depo–Medrol in his right elbow. (Tr. 272.)

Dr. Nagendra referred the plaintiff for an MRI of his cervical spine, which was performed on October 30, 2008. (Tr. 275.) It showed no evidence of focal disk herniation or significant central stenosis, but did show mild uncinate spurring with disk bulges at the C3-C4 level, mild disk bulges at the C4-C5 levels, and mild uncinate spurring on the left side at the C5-C6 level. (Tr. 276.) An MRI of the plaintiff's lumbar spine, performed on November 7, 2008, showed facette arthropathy and moderate central disk herniation contributing to spinal stenosis and foraminal narrowing at the L4-L5 level, and mild bilateral forminal narrowing at L5-S1. (Tr. 277-278.) An EMG-NCV study, which was performed on January 20, 2009 to evaluate the plaintiff's "persistent wrist pain," showed that he had bilateral carpal tunnel syndrome. (Tr. 254.)

On February 6, 2009, Dr. Gary Starkman, a neurologist, examined the plaintiff. (Tr. 282-85.) He diagnosed the plaintiff with post-traumatic headache and post-traumatic right elbow tendonitis, as well as pain-related insomnia and post-traumatic cervical and lumbar pain related to sprain or strain. (Tr. 284.) Dr. Starkman concluded that the plaintiff could return to his job as a truck washer, but not his second job as a tile and marble helper. (*Id.*) He also found that the

plaintiff was restricted in his ability to kneel, squat, bend, and lift. (*Id.*) Dr. Starkman thought that the plaintiff "[might] recover completely provided more aggressive pain management with more potent medications and [if] certain cervical and lumbar-sacral injections are offered to and accepted by the patient." (*Id.*) He found that "it can be possible to stabilize this patient's condition . . . within three to four months," and that the plaintiff needed further treatment. (*Id.*)

On September 30, 2009, the plaintiff twisted his elbow when an air gun he was using at work jammed. (Tr. 326.) An MRI of his right elbow revealed that the plaintiff had medial epicondylitis and a flexor tendon tear of his right elbow. (Tr. 327.)[5] Dr. Nagendra recommended injections to the plaintiff's right elbow and flexor tendons, and prescribed medications and physical therapy. (Tr. 325, 327.)

Between December 15, 2008 and June 4, 2009, Dr. Nagendra treated the plaintiff's injuries with multiple injections to his right elbow, lumbar spine, cervical spine, and bursa. (Tr. 223, 226, 229, 230, 237, 242, 245, 248, 253, 269, 329, 330.) He also treated the plaintiff with physical therapy and pain management. Dr. Nagendra's notes from the plaintiff's February 26, 2009, March 19, 2009, March 23, 2009, April 9, 2009, and April 16, 2009 visits indicate that it was "difficult for [the plaintiff] to sit, bend and stand for extended periods of time," although the Epidural injections had relieved some of his low back pain. (Tr. 238, 240, 243, 246, 249.)

Dr. Starkman re-examined the plaintiff on November 2, 2009, and found that his condition "ha[d] stabilized as much as it can be expected to stabilize at this point." (Tr. 211-13.)

Between November 5, 2009 and March 11, 2010, Dr. Nagendra gave the plaintiff bursa, cervical, and lumbar injections. (Tr. 203, 206, 209, 217-18, 219, 330.) The plaintiff had another lumbar spine MRI, ordered by Dr. Sharon, on March 23, 2010. (Tr. 379.) The findings included

---

[5] The plaintiff also had another MRI of his right elbow on November 19, 2009. (Tr. 334.)

a right laminectomy and disc herniation at the L4-L5 level, a disc bulge at L5/S1, and fatty infiltration of the filum terminale extending from the L3/4 to the S1 levels. (Tr. 381.)

**Post-Onset Date**

In August 2011, Dr. Idan Sharon conducted a series of tests and scans on the plaintiff. An NCV-EMG of the plaintiff's upper extremities revealed moderate chronic C8 radiculopathy[6] on the right and left, carpal tunnel syndrome affecting sensory and motor components, and ulnar neuropathy of his upper extremities. (Tr. 351-52.) In addition, an MRI of the plaintiff's lumbar spine showed left paracentral disc herniation at L3-L4; postoperative changes on the right at L4-L5 and L5-S1 without recurrent disc herniation; and residual right neural foraminal narrowing at L5-S1, due to diffuse disc bulging. (Tr. 345.) The plaintiff also had an NCV-EMG of his lower extremities, which revealed evidence of moderate chronic L5 radiculopathy on the right and left. It also revealed evidence of tibial neuropathy with axon loss of the right lower extremity. (Tr. 348.)[7]

A September 19, 2012 MRI of the lumbar spine showed no significant change from the plaintiff's August 8, 2011 MRI. (Tr. 378.) A September 26, 2012 MRI of the plaintiff's cervical spine showed no significant change from a December 2011 MRI,[8] which showed left foraminal herniation impinging on the left C6 nerve root at C5-C6 and straightening of the cervical curvature without fracture or cord compression. (Tr. 379.) The plaintiff also had an MRI of his

---

[6] Radiculopathy is a "condition caused by compression, inflammation and/or injury to a spinal nerve root." *See* National Institute of Health website at http://www.ninds.nih.gov/disorders/backpain/detail_backpain.htm (last visited 3/23/2016).

[7] September 2012 NCV-EMG's of the plaintiff's upper and lower extremities had similar results. (Tr. 384-85, 387-88.)

[8] The results of this MRI do not appear to be in the record.

left wrist on March 14, 2012, which revealed ulnolunate impaction syndrome and mild radiocarpal effusion. (Tr. 382.)

## ii. **Consultative Physicians**

### Dr. Eyassu

On October 3, 2011, Dr. Rahel Eyassu, an internist, examined the plaintiff at the request of the Division of Disability Determinations. (Tr. 359-62.) The plaintiff told the doctor that he had chronic neck, lower back, and right elbow pain. (Tr. 359.) He also described his past medical history, as well as his daily routine. (Tr. 359-60.) He described his pain as "sharp" and "throbbing," and said that it radiated to his neck. (Tr. 359.) He said that he experienced about six migraine headaches a month. (*Id.*)

Dr. Eyassu opined that the plaintiff did not appear to be in "acute distress," that his gait was normal, that he could walk on his heels and toes without difficulty, that he could squat to 60% of full capacity, and that he could rise from his chair without any difficulty. (Tr. 360.) The plaintiff's cervical spine showed "full flexion, extension, lateral flexion and full rotary movements bilaterally with pain on range of motion." (Tr. 361.) The plaintiff's lumbar spine flexion was 45 degrees, extension 15 degrees, lateral and rotary movements 20 degrees. (*Id.*) While raising his legs at 70 degrees caused him pain in the lower back, he did not have pain while "in the sitting position at 90 degrees." (*Id.*) He had full range of motion of his shoulders, elbows, forearms, wrists, hips, knees, and ankles. (*Id.*) He had right elbow pain on flexion, extension, supination and pronation, but his hand and finger dexterity were intact. (Tr. 361-62.)

Dr. Eyassu's ultimate diagnosis was that the plaintiff had chronic low back pain, chronic cervicalgia, right tennis elbow, and migraine headaches. (Tr. 362.) The plaintiff's prognosis was "fair," and his limitation "is moderate on repetitive bending, turning and twisting, activity

9

that would require excessive neck movement, and activity that would require sustained pulling, pushing and heavy lifting." (*Id.*)

### b. Psychological Evaluations

### i. Treating Physician

Dr. Eric Peselow, a psychiatrist, started treating the plaintiff for bipolar disorder and obsessive compulsive disorder in November of 2008. (Tr. 38, 399.) On March 11, 2009 and January 20, 2010, in forms completed in connection with the plaintiff's employment at the Sanitation Department, Dr. Peselow listed the plaintiff's diagnosis as bipolar disorder and prescribed a treatment plan of psychotherapy and medication management. (Tr. 396-98.) On the March 2009 form, he noted that the plaintiff was "currently stable w/ meds," and that he was "able to work no restrictions." (Tr. 397-98.)

The record also includes treatment notes submitted by Dr. Peselow from the period of October 26, 2011 through December 3, 2012.[9] (Tr. 391-95.) Between October 26, 2011 and September 5, 2012, the notes reflected that the plaintiff was having "mild difficulty" with his son, that his physical health was good except for a herniated disk, that his symptoms of irritability had been improved through medication, and that he was "[m]uch improved from baseline." (Tr. 391-94.) Treatment notes from between September 10, 2012 and December 3, 2012 indicate that the plaintiff was having further difficulties with his stepson, but that he was responding well to interventions. (Tr. 394-95.)

---

[9] It is not at all clear that the treatment notes that were submitted along with Dr. Peselow's reports were actually written by Dr. Peselow; the notes from October 26, 2011 to September 5, 2012 are unsigned, and the notes from September 10, 2012 to December 3, 2012 are generally signed with the initials "JD." (Tr. 391-95.)

In a February 28, 2013 medical source statement, Dr. Peselow wrote that the plaintiff had depression, mood disturbances, anxiety, difficulty concentrating, social withdrawal, hostility and irritability, obsessions and compulsions, and sleep disturbances; he was treating the plaintiff twice a month with psychotherapy and medication management. (Tr. 399.)

Dr. Peselow also observed that the plaintiff was:

> markedly limited in his ability to maintain attention and concentration for extended periods, work near others without being distracted by them, complete a normal work week at a consistent pace without psychological interruptions, interact appropriately with the general public, get along with coworkers without exhibiting behavioral extremes, respond appropriately to changes in the work setting, set realistic goals or complete any activities requiring concentration and persistence. (*Id.*)

According to Dr. Peselow, the plaintiff's mental illness would cause him to "decompensate and emotionally withdraw in a work-like setting due to his inability to follow instruction or to be organized." (*Id.*) He concluded that the plaintiff would be "unable to tolerate even low stress work." (*Id.*)

### ii. Consulting Physicians

**Dr. Lancer**

Dr. Lancer, a psychologist, examined the plaintiff on October 3, 2011. (Tr. 355-58.) The plaintiff told Dr. Lancer that he had difficulty falling asleep, had lost fifteen pounds, and had depressive symptoms including dysphoric mood, crying spells, hopelessness, guilt, fatigue, and worthlessness. (Tr. 355.) He also reported that he was easily fatigued and worried, and had restlessness and muscle tension. (*Id.*) Dr. Lancer diagnosed the plaintiff with depressive and anxiety disorders. (Tr. 357.)

During the exam, Dr. Lancer found that the plaintiff was "cooperative," and "[h]is manner of relating, social skills, and overall presentation" were "adequate." (Tr. 356.) The

plaintiff could "dress, bathe, and groom himself," cook and prepare food, clean, do laundry, shop, manage money, take public transportation, socialize with his fiancé and stepson, and "is very close" to his sisters, cousins, brother-in-law, nieces and nephews. (Tr. 357.) He spends his days walking, watching tv, and reading. (*Id.*)

In addition, Dr. Lancer found that the plaintiff could "follow and understand simple directions," "perform simple tasks independently," "maintain attention and concentration," and "maintain a regular schedule." (*Id.*) He further found that the plaintiff could "learn new tasks," "perform complex tasks independently," "maintain attention and concentration," "make appropriate decisions," "relate adequately with others," and "appropriately deal with stress." (*Id.*) Dr. Lancer then concluded that the results of his evaluation were consistent with psychiatric problems that "may significantly interfere with the claimant's ability to function on a daily basis." (*Id.*)

### Dr. Blackwell

Dr. Blackwell, another psychologist, evaluated the plaintiff on October 17, 2011, and concluded that the plaintiff had affective and anxiety disorders, but that his impairments were "not severe." (Tr. 364.)[10]

## IV. The ALJ's Decision

In his March 20, 2013 opinion, ALJ Miller determined that in view of the plaintiff's age, education, work experience, and residual functional capacity, he could successfully adjust to other work, and was not disabled. (Tr. 10-22.) In reaching his decision, the ALJ utilized the sequential evaluation process set forth in the Code of Federal Regulations. 20 C.F.R. § 416.920. Under that analysis, ALJ Miller considered the following: whether the plaintiff was engaged in

---

[10] There are no supporting notes, nor are any other portions of the form completed.

any substantial "gainful activity," whether he had any severe impairments, whether those impairments met the severity of the listed impairments in Appendix 1,[11] and whether, despite those impairments, the plaintiff had the residual functional capacity to return to his past work or perform work that exists in significant numbers in the national economy.

At Step 1, the ALJ found that the plaintiff had not engaged in "substantial gainful activity" since April 18, 2011. (Tr. 12.)[12] At Step 2, the ALJ found that the plaintiff had the following severe impairments: cervical and lumbar disc herniations, with radiculopathy, bilateral carpal tunnel syndrome, degenerative joint disease of the right elbow, migraine headaches, and bipolar disorder. (Tr. 13.)

At Step 3, the ALJ concluded that the plaintiff's various physical impairments and mental conditions did not satisfy the severity requirements set forth in 20 CFR Part 404. (*Id.*) He found that the plaintiff's elbow impairment did not qualify as a listed impairment because there was "no evidence of an impairment in each upper." (*Id.*) As for the plaintiff's back problems, the ALJ found that there was no evidence that the plaintiff had "muscle weakness accompanied by sensory or reflex loss," nor was there evidence of "positive straight-leg raising tests in both the sitting and supine positions." (*Id.*) Moreover, neither plaintiff's carpal tunnel syndrome nor his radiculopathy qualified as listed impairments, because there was "no evidence of significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movement, gait or station." (*Id.*) In this regard, the ALJ observed that

---

[11] 20 C.F.R. Pt. 404, Subpt. P, App. 1.

[12] The ALJ did not include the period from April to October, 2011, when the plaintiff worked for his brother-in-law, who provided him special treatment. (Tr. 12.)

the plaintiff had, in a consultative examination, walked normally, had normal muscle and grip strength, and intact hand and finger dexterity. (*Id.*)

He found that the plaintiff's mental impairments did not meet or medically equal the criteria set forth in paragraph B of 12.04, which mandates that the plaintiff have at least two of the following: marked restrictions on activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace, or repeated episodes of decompensation, each of extended duration. (*Id.*)[13] In reaching this conclusion, the ALJ considered the plaintiff's testimony about his daily routine, as well as the opinions of Dr. Peselow and Dr. Lancer. (Tr. 13-14.) ALJ Miller characterized the plaintiff's restriction in daily living as "mild," pointing to the plaintiff's own description of his daily activities, which demonstrated a degree of independence and included handling money, taking daily walks, and taking care of himself and his home. (Tr. 13.) As far as social functioning, the ALJ found that the plaintiff's difficulties were "moderate," citing the plaintiff's discomfort with crowds, mood swings, and anger issues; on the other hand, the plaintiff spent time regularly with other people, maintained close relationships with his family, and ran errands independently. (Tr. 14.) Similarly, the ALJ found that the plaintiff had "moderate" difficulties with concentration, persistence, and pace. (*Id.*) In this regard, the ALJ relied on the plaintiff's own descriptions of his abilities, both in his testimony and in his Function Report. (*Id.*)

---

[13] In the context of a mental disorder, a marked limitation is "more than moderate but less than extreme." A marked limitation "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1. 12.00(C.)

ALJ Miller noted Dr. Peselow's conclusion that the plaintiff had marked limitations in these areas, but found that the psychiatric treatment notes did not support that conclusion. (*Id.*) Moreover, the consultative examiner, Dr. Lancer, found that the plaintiff's attention, memory and concentration were "intact." (*Id.*) For these reasons, the ALJ found that the plaintiff's limitations in concentration, attention and memory were moderate rather than marked. (*Id.*) Finally, the ALJ found that the plaintiff had no episodes of decompensation, had only routine outpatient treatment, and had not required hospitalization or in-patient treatment for any psychiatric condition. (*Id.*) Under these circumstances, the ALJ found that the plaintiff's mental impairment did not satisfy the requirements of paragraph B. (*Id.*)

At Step 4, the ALJ evaluated the plaintiff's Residual Functional Capacity ("RFC") to do his past relevant work, and found that he retained the capacity to perform a "range of light work," as defined in 20 CFR 404.1567(b). (Tr. 15-20.) First, the ALJ considered whether the plaintiff had an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the plaintiff's pain or other symptoms. (Tr. 15.) With respect to his physical impairments, the ALJ considered Dr. Nagendra's treatment notes, Dr. Starkman's opinion, which he accorded "some weight," EMG and MRI results, and Dr. Eyassu's consultative opinion, which he accorded "great weight." (Tr. 15-16, 20.) As to the plaintiff's mental impairments, the ALJ considered Dr. Lancer's consultative opinion, along with the Freedom from Fear treatment notes, and Dr. Peselow's medical source statement. (Tr. 17.) The ALJ accorded "some weight" to Dr. Peselow's source statement, finding that his opinions were not supported by the treatment records or the plaintiff's own statements regarding his daily activities, and "great weight" to Dr. Lancer's opinions, which he found were "well supported by the psychiatric treatment records." (Tr. 19.)

Based on this evidence, the ALJ found that the claimant's medically determined ailments could reasonably be expected to cause the alleged symptoms; however, he found that the plaintiff's statements concerning the "intensity, persistence, and limiting effects" of the symptoms were "not entirely credible." (Tr. 18.) In assessing the plaintiff's credibility, he cited the medical evidence indicating that his condition had remained relatively stable over time, as well as Dr. Eyassu's finding that he had only moderate physical limitations. (*Id.*) Further, as to his mental health, the ALJ explained that the Freedom from Fear treatment notes indicated symptom improvement with medication and therapy, and that Dr. Lancer had reported no positive findings on his mental status examination. (*Id.*)

The ALJ also considered the plaintiff's own testimony regarding his capacities and treatment. (Tr. 17-19.) He recounted the plaintiff's descriptions of his daily activities, including his ability to shop, run errands, do some light cooking, and straighten up around the house, as well as his testimony that he interacted with other people on a daily basis, and that he had "very close" family relationships. (Tr. 18.) The ALJ found that "[t]hese admissions" indicated that the plaintiff's mental and physical conditions do not "significantly limit his ability to perform his daily activities independently." (*Id.*) He also considered the impact of medication and treatment on the plaintiff's symptoms. (Tr. 19.)

In sum, the ALJ found that the plaintiff's RFC to do "light work" was supported by "the objective diagnostic testing" that showed that his physical impairments had remained stable with no further degeneration, the psychiatric treatment notes that showed symptom improvement and stability with treatment and medication, and the plaintiff's own testimony regarding his functional abilities. (Tr. 20.) He concluded that given his RFC, the plaintiff did not have the

capacity to return to his past work as a sanitation worker or a tile finisher, as these jobs were too "exertionally demanding." (Tr. 20.)

Finally, at Step 5, the ALJ found that although the plaintiff was unable to return to his past work, he could successfully adjust to other work. (Tr. 20-22.) In support of this determination, he relied on vocational expert Raymond Cestar, who testified that given the plaintiff's residual functional capacity, he could work as a cafeteria attendant, a photocopy machine operator, or a laundry folder, and that these jobs existed in significant numbers in the national economy. (Tr. 21.) As a result, the ALJ determined that the plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 22.)

## DISCUSSION

### I.    Standard of Review

When a plaintiff challenges an ALJ's determination that he is not disabled, the "district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart,* 388 F.3d 377, 384 (2d Cir. 2004) *as amended on reh'g in part,* 416 F.3d 101 (2d Cir. 2005); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"). "Substantial evidence" is "more than a scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)).

In reviewing the administrative record and the ALJ's decision, a district court may not "substitute its own judgment for that of the [ALJ], even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir. 1991).

Rather, it is for the agency, and not the court, "to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). Once an ALJ finds facts, the district court can reject those facts "only if a reasonable factfinder would *have to conclude otherwise.*" *Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (internal citation omitted).

## II. Analysis

The plaintiff raises two challenges to the ALJ's decision finding that he was not disabled. First, he argues that the ALJ's finding that he is able to do "a significant range of light work activities" is not supported by substantial evidence in the record. (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Judgment on the Pleadings and in Support of Plaintiff's Cross-Motion for Judgment on the Pleadings ("Pl. Mem.") at 9-10.) Second, the plaintiff argues that the ALJ did not properly apply the "treating physician rule" in deciding how much weight to afford to the opinion of his treating psychiatrist. (*Id.* at 10-11.) I address these contentions in reverse order.

### A. Treating Physician Rule

The plaintiff challenges the ALJ's decision to afford only "some weight" to the opinion of one of his treating physicians, Dr. Peselow, who treated the plaintiff for bipolar disorder and obsessive compulsive disorder beginning in November of 2008. (Pl. Mem. at 11.) The plaintiff argues that the ALJ did not follow the "treating physician" rule. (*Id.* at 10-11.) For the reasons set forth below, I find that the ALJ properly applied the "treating physician rule" in considering Dr. Peselow's opinion.

The Social Security regulations require that an ALJ afford "controlling weight" to the treating physician's opinion about the "nature and severity" of an impairment, as long as the opinion is "well-supported by medically acceptable clinical and diagnostic laboratory techniques

18

and is not inconsistent with the other substantial evidence in [the] record," 20 C.F.R. §

404.1527(c)(2), including the opinions of other medical experts. *Halloran v. Barnhart*, 362 F.3d

28, 32 (2d Cir. 2004). The treating physician rule is particularly important in the mental health

context, "[b]ecause mental disabilities are difficult to diagnose without subjective, in-person

examination.'" *Canales v. Comm'r of Soc. Sec.*, 698 F.Supp.2d 335, 342 (E.D.N.Y. 2010)

(quoting *Richardson v. Astrue*, No. 09 Civ. 1841, 2009 WL 4793994, at *7 (S.D.N.Y. Dec. 14,

2009)); *see also Rodriguez v. Astrue*, No. 07 Civ. 534, 2009 WL 637154, at *26 (S.D.N.Y. Mar.

9, 2009) ("The mandate of the treating-physician rule to give greater weight to the opinions of

doctors who have a relationship with a plaintiff is particularly important in the mental-health

context.").

  If an ALJ does not afford a treating physician's opinion controlling weight, he must

consider various factors in determining how much weight to give the opinion, including: (1) the

length of the treatment relationship and the frequency of examination; (2) the nature and extent

of the treatment relationship; (3) the evidence in support of the treating physician's opinion; (4)

the consistency of the opinion with the entirety of the record; (5) whether the treating physician

is a specialist; and (6) other factors that are brought to the attention of the Social Security

Administration that tend to support or contradict the opinion. 20 C.F.R. 404.1527(c)(2)(i-ii) &

c(3)-(6). The ALJ must provide "good reasons" when he decides not to afford controlling weight

to a treating physician's opinion, 20 C.F.R. 404.1527(c)(2), and must "comprehensively set forth

his reasons" for the weight he does choose to assign. *Burgess v. Astrue*, 537 F.3d 117, 129

(E.D.N.Y. 2008) (internal citation omitted).

  Here, the ALJ considered Dr. Peselow's opinion at Steps 3 and 4 of his analysis. First,

the ALJ considered Dr. Peselow's opinion at Step 3, in determining whether the plaintiff's

mental impairments met or equaled the required severity. Specifically, the ALJ considered Dr. Peselow's opinion in finding that the plaintiff had only moderate difficulties with concentration, persistence, or pace. (Tr. 14.) The ALJ discounted Dr. Peselow's opinion that the plaintiff had marked limitations in his ability to concentrate, to work near others without becoming distracted, and to complete a normal workweek without psychological interruption, and justified that decision; he found that Dr. Peselow's treatment records did not support his ultimate conclusion, as they "[did] not contain any references to complaints of impaired attention and concentration and indicate[d] that the claimant's primary symptoms [were] mood swings and depression." (Tr. 14.) He further found that Dr. Peselow's statements about the plaintiff's attention, concentration, and memory were contradicted by Dr. Lancer, the consultative examiner, as well as by the plaintiff's own statements about his abilities and habits. (Tr. 14.)

In determining the plaintiff's RFC, the ALJ discounted Dr. Peselow's conclusion that the plaintiff would "decompensate and emotionally withdraw in a work-like setting" and would be "unable to tolerate even low stress work." (Tr. 399.) Again, ALJ Miller justified that decision. He found that these conclusions were not supported by the treatment records, which indicated that the plaintiff's condition had remained "relatively stable with marked symptom improvement on medication despite dealing with recurrent stressful situations relating to his stepson." (Tr. 19.) Further, the ALJ cited the plaintiff's "own statements regarding his daily activities and social interactions" which did not "support the severe limitations assessed by Dr. Peselow." (*Id.*) For these reasons, the ALJ declined to afford Dr. Peselow's opinions controlling weight, and instead afforded them only "some weight." (*Id.*)

The ALJ had "good reasons" for his decision not to give controlling weight to Dr. Peselow's opinion. First, as the ALJ correctly observed, the psychiatric treatment records from

Freedom from Fear did not comport with Dr. Peselow's ultimate conclusions about the plaintiff's condition. (Tr. 19.) The treatment records state that the plaintiff was "[m]uch improved from baseline," and that although he was having difficulties with his stepson, he was responding "well to interventions." (Tr. 391-95.) They also indicate that the plaintiff had some irritability, but that the symptoms decreased when the plaintiff was put on a higher dose of Depakote. (Tr. 391-93.) The treatment notes do not reflect any problems with attention or concentration, behavorial extremes, or inability to interact with the general public. (Tr. 391-95.) Notably, in a New York Sanitation form dated March 16, 2009, Dr. Peselow stated that the plaintiff was "currently stable w/meds" and that he was able to work without any restrictions. (Tr. 397.) The plaintiff does not claim that his condition worsened since 2009; in fact, treatment records from 2011 on indicate that the plaintiff was "much improved" from his baseline. (Tr. 391-94.) Further, the plaintiff testified that he stopped working at the Sanitation Department because he could no longer do the physical aspects of the job, but did not state that his mental impairments impacted his ability to continue working there. (Tr. 31.)

While an ALJ may not afford less than controlling weight to a treating physician's opinion based solely on internal conflicts in his findings, *Lamond v. Astrue*, 440 Fed.Appx. 17, 21 (2d Cir. 2011) (citing *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)), here, the record includes the consultative opinion of Dr. Lancer, who examined the plaintiff.[14] Dr. Lancer found

---

[14] It is well-settled that a consulting physician's opinion can constitute substantial evidence supporting an ALJ's conclusions. *Suarez v. Colvin*, 102 F.Supp.3d 552, 577 (S.D.N.Y. 2015) (citing *Rosier v. Colvin*, 586 Fed.Appx. 756, 758 (2d Cir. 2014)). Further, an ALJ may give greater weight to a consultative than treating physician's opinion if he finds that the consultative physician's opinion is more consistent with the underlying medical evidence. *Suarez*, 102 F.Supp.3d at 577; *Manning v. Colvin*, No. 13–CV–497, 2014 WL 5308189, at *8-9 (W.D.N.Y. Oct. 16, 2014) (ALJ properly gave little weight to the treating physician's opinion and "great weight" to the consultative examiner's prognosis because the consultative examiner's opinion was more consistent with the medical evidence of record).

that the plaintiff could "follow and understand simple directions," "perform simple tasks independently," maintain "attention and concentration," maintain "a regular schedule," "learn new tasks," "make appropriate decisions," "relate adequately with others" and "appropriately deal with stress." (Tr. 357.) The ALJ afforded "great" weight to Dr. Lancer's opinion, because it was based on a "thorough in person examination" of the plaintiff and was consistent with the plaintiff's psychiatric treatment records; those records revealed that the plaintiff's symptoms had improved and become stable with treatment. (Tr. 19.)

The ALJ also took into account the plaintiff's own statements regarding his daily routine and social activities, which were not consistent with Dr. Peselow's findings. (Tr. 19.) For example, in a Function Report that the plaintiff filled out on September 18, 2011, he stated that he spent time with other people every day, that he did not have any problems getting along with other people, that he did not have any difficulties paying attention, and that he could complete what he started. (Tr. 171, 173.) The ALJ found that these statements "do not support the severe limitations assessed by Dr. Peselow." (Tr. 19.)

Based on the lack of support for Dr. Peselow's conclusions in the treatment notes and the Department of Sanitation forms he completed, the conflicting findings of Dr. Lancer, and the plaintiff's own statements regarding his capacities, I find that the ALJ had "good reason[s]" for affording Dr. Peselow's opinion less than controlling weight. *See Cichocki v. Astrue*, 534 Fed.Appx. 71, 75 (2d. Cir. 2013) (finding that where the treating physician's medical source statement "conflicted with his own treatment notes," the ALJ was not required to afford his opinion controlling weight); *Suarez v. Colvin*, 102 F.Supp.3d 552, 574-8 (S.D.N.Y. 2015) (finding that ALJ's decision to give "little weight" to treating physicians' opinion was supported by substantial evidence because the opinion was not "well-supported by the underlying medical

22

evidence contained in their other reports" and it "conflicted with the reports from consultative examiners"); *Frawley v. Colvin*, No. 5:13-cv-1567, 2014 WL 6810661, at *6 (N.D.N.Y. Dec. 2, 2014) (affirming ALJ's decision to afford treating physician's opinion little weight where the physician's ultimate assessment was inconsistent with the treating notes and the plaintiff's own testimony regarding her abilities) (adopting report and recommendation). Moreover, the ALJ complied with the requirements of the "treating physician rule" by providing a comprehensive explanation for his decision not to afford Dr. Peselow's opinion controlling weight. He noted the length and nature of the plaintiff's treatment relationship with Dr. Peselow, the evidence in support of Dr. Peselow's opinion, and the conflicting evidence in the record. (Tr. 14, 19.)[15] Based on the record here, the Court defers to the ALJ's well-supported determination regarding the weight to afford Dr. Peselow's opinion.

**B.    RFC Determination**

The plaintiff also challenges the ALJ's ruling that he retains a residual functional capacity ("RFC") to conduct a "range of light work." (Pl. Mem. at 9-10.) The plaintiff argues that no physician expressed an opinion about his "capacity for sitting, standing, or walking." (*Id.* at 9.) Nor, according to the plaintiff, is there a basis for finding that he could lift up to 20 pounds, with frequent lifting of up to 10 pounds, which would be required in a job classified as "light work." (*Id.* at 10.)

---

[15] As the record provides sufficient support for the ALJ's decision not to afford controlling weight to Dr. Peselow's opinion, I do not find that the ALJ needed to further develop the record by seeking clarification of the perceived inconsistencies between the psychiatric treatment records and Dr. Peselow's opinion. *See, e.g., Lamond v. Astrue*, 440 F. App'x 17, 21-22 (2d Cir. 2011) (finding that although there were inconsistences in the report of the treating physician, there would be "no merit" in requiring the ALJ to have *sua sponte* contacted the treating physician, as the record provided a "sufficient basis for the ALJ's decision not to give controlling weight" to the treating physician's opinion).

In classifying a plaintiff's RFC, an ALJ "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. 404.1545 and 416.945." *Cichocki v. Astrue,* 729 F.3d 172, 176 (2d Cir. 2013) (*per curiam*). These functions include "physical abilities such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions; mental abilities such as understanding, remembering, carrying out instructions, and responding appropriately to supervision; and other abilities that may be affected by impairments, such as seeing, hearing, and the ability to tolerate environmental factors." *Id.*

The regulations provide that "light work" involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," "a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. 404.1567(b). In order to be considered capable of performing light work, a person must be able to do "substantially all" of these activities. *Id.* While it is not *per se* error for an ALJ not to conduct an explicit function-by-function analysis of all illustrative functions, "[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Cichocki,* 729 F.3d at 177-78; *see also Elliot v. Colvin,* No. 13-cv-2673, 2014 WL 4793452, at *19-20 (E.D.N.Y. Sept. 24, 2014) (remanding case in which doctor's opinion, to which the ALJ had afforded strong weight, "did not directly assess Plaintiff's ability to lift objects of up to 20 pounds, or to walk or sit for the duration expected of a light duty position.")

In determining the plaintiff's RFC, the ALJ conducted a comprehensive review of the evidence in the record, including the medical evidence and opinions of the plaintiff's treating and

consultative physicians, the results of his medical testing, including EMG and MRI results, and the plaintiff's testimony regarding his symptoms, limitations and daily activities. (Tr. 15-20.) This review included reasoned explanations regarding the weight he afforded to the opinions of each of the plaintiff's physicians. (Tr. 19-20.) As a result of this review, the ALJ found that the plaintiff retained the capacity to:

> occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds; he can occasionally stoop, bend and crouch, but can never crawl; he can frequently balance, reach, and perform fine and gross manipulation; his work must not involve hazards such as machinery and heights; and his work must involve only simple, routine, and repetitive tasks with only occasional changes in routine. (Tr. 15.)

While these findings are a result of a comprehensive review of the evidence, they do reveal a gap in the record: the ALJ did not make an explicit determination regarding the plaintiff's abilities to sit, stand, or walk, or his abilities to lift weight. (Tr. 15.) While this does not constitute error *per se*, *Cichocki*, 729 F.3d at 177, the court must consider whether the ALJ "failed to assess [the plaintiff's] capacity to perform relevant functions, despite contradictory evidence in the record." *Id*. at 177-78.

First, the plaintiff's abilities to sit and stand, as well as to lift certain quantities of weight, were relevant to the ALJ's determination that the plaintiff was not disabled. When the ALJ posited hypothetical scenarios to the vocational expert, Raymond Cestar, at the March 5, 2013 hearing, he specifically included descriptions of the hypothetical individual's abilities to sit, stand, and lift weight. (Tr. 40-42.) In the first two scenarios, the ALJ asked Mr. Cestar to consider a hypothetical individual, who, among other abilities and limitations, could "lift and/or carry up to 20 pounds occasionally [and] 10 pounds frequently," could "stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday," and could "sit with

normal breaks for a total of about six hours in an eight-hour workday," in a job that allowed him "to alternate positions between sitting and standing an average of once every 30 minutes." (Tr. 41.) Mr. Cestar testified that this hypothetical individual would not be able to return to his past work as a sanitation worker or a tile finisher, and that there was no other unskilled work that he could perform, particularly because of the requirement that he alternate between sitting and standing every 30 minutes. (Tr. 41-42.) It was only when the ALJ removed the limitation that the hypothetical individual had to alternate between sitting and standing every 30 minutes that Mr. Cestar found that he could adjust to other unskilled work, including cafeteria attendant, photocopy machine operator, and laundry folder. (Tr. 42.) The ALJ relied on Mr. Cestar's finding in reaching the conclusion that the plaintiff could perform other work in the national economy, and therefore was not disabled. (Tr. 21-22.) In other words, the plaintiff's abilities to lift certain amounts of weight, and his ability to sit and stand for certain periods of time, were relevant to the ALJ's determination that the plaintiff was not disabled.

The record, however, does not contain any medical opinion from any physician—treating or otherwise—about the plaintiff's abilities to sit and stand, or his capacity to lift weight. For example, Dr. Nagendra, who treated the plaintiff for his wrist injury and for injuries sustained in the 2008 car accident, noted that the plaintiff reported difficulties with sitting, bending and standing for extended periods of time. (Tr. 238, 240, 243, 246, 249). He also recommended that the plaintiff avoid "heavy physical activities," but did not specify what would constitute a "heavy physical" activity. (Tr. 274.) Another of the plaintiff's treating physicians, Dr. Starkman, found that the plaintiff had a "limited ability" to kneel, squat, bend or lift heavy objects, but he did not quantify what would constitute "heavy" lifting. (Tr. 212.)

Similarly, Dr. Eyassu, a consultative physician, opined that the plaintiff had "moderate" limitations on activities that required repetitive bending, turning, twisting, activities that required excessive neck movement, and activities that required sustained pulling, pushing, and heavy lifting. (Tr. 362.) She expressed no opinion about the plaintiff's capacity to sit or stand. (*Id.*) Nor did she quantify what would constitute "heavy lifting." (*Id.*)[16] In sum, the record does not contain any medical opinion regarding the plaintiff's ability to sit or stand, or lift objects of the weight required for "light work."[17]

Moreover, the record contains evidence suggesting that the plaintiff has limitations on his abilities in these areas. At his hearing, the plaintiff testified that he could not sit, stand or walk for a long period of time, and that he could not lift more than 5-10 pounds comfortably. (Tr. 36, 40.) Further, Dr. Nagendra's treatment notes reflected the plaintiff's expressed difficulties with sitting, bending, and standing, and Dr. Starkman recommended that the plaintiff refrain from "heavy lifting." (Tr. 212, 238, 240, 243, 246, 249). As a result of this evidence—including

---

[16] As the Commissioner has a duty to present "affirmative evidence" to sustain its burden of proof that the plaintiff can perform other substantial work in the economy, the fact that Dr. Eyassu and Dr. Starkman did not specifically note any limitations on the plaintiff's abilities to sit, stand, or lift certain quantities of weight among other listed limitations would not be sufficient evidence in support of a finding that the plaintiff had no limitations in these areas. *See Rosa v. Callahan*, 168 F.3d 72, 81 (2d Cir. 1999) (rejecting argument that the plaintiff did not suffer from any impairments that were "unlisted by either of the consulting physicians."); *see also Davis v. Shalala*, 883 F.Supp. 828, 837 (E.D.N.Y. 1995) (disagreeing with the ALJ's decision that the plaintiff could do sedentary work when the conclusion "was not based on a positive finding that [the plaintiff] could perform sedentary work. Rather, it was based on a negative finding that nothing in the record militated against the conclusion that [he] could perform such work.").

[17] The plaintiff's Functional Capacity Assessment does include assessments of the plaintiff's abilities to sit, stand, walk, and lift specified amounts of weight. (Tr. 44-49.) As it was conducted, however, by a "Single Decision Maker" who is not a medical professional, it is not entitled to any weight as a medical opinion. *See Box v. Colvin*, 3 F.Supp.3d 27, 46 (E.D.N.Y. 2014); *Sears v. Astrue*, 2:11-CV-138, 2012 WL 1758843, at *6 (D.Vt. May 15, 2012) (collecting cases).

medical evidence—about the plaintiff's limitations on sitting, standing, and lifting, the ALJ was required to analyze the plaintiff's limitations in these areas. *See Glessing v. Comm'r of Soc. Sec.*, No. 13 Civ. 1254, 2014 WL 1599944, at *9 (E.D.N.Y. Apr. 17, 2014) (remanding to Commissioner where, among other things, the ALJ found that the plaintiff could stand or walk for 6 hours in an 8 hour workday, but the plaintiff's treating physician had "consistently reported" that the plaintiff suffered from pain when walking).

Because there are no medical opinions about the plaintiff's abilities to sit, stand, and lift certain quantities of weight, and because there is evidence that the plaintiff has limitations in these areas, I find that the ALJ's decision that the plaintiff retains a residual functional capacity for "light work" is not supported by substantial evidence. *See, e.g., Elliot v. Colvin*, No. 13-cv-2673, 2014 WL 4793452, at *20 (E.D.N.Y. Sept. 24, 2014) (remanding case in which doctor's opinion, to which the ALJ had afforded strong weight, "did not directly assess Plaintiff's ability to lift objects of up to 20 pounds, or to walk or sit for the duration expected of a light duty position"); *Burton v. Colvin*, No. 6:12-cv-6347, 2014 WL 2452952, at *9 (W.D.N.Y. June 2, 2014) (finding legal error where ALJ had failed to determine the plaintiff's ability to sit or stand, no medical source had opined that the plaintiff was able to stand or walk most of the workday, and the ALJ did not explain the basis for his "unstated conclusion" that the plaintiff would be capable of walking for up to 6 hours per 8-hour day); *Beylo v. Astrue*, No. 10-cv-00354, 2012 WL 4491043, at *7-8 (N.D.N.Y. Sept. 28, 2012) (finding ALJ had committed legal error at Step 4 where "the record is devoid" of any medical evidence "that explicitly states the time [the plaintiff] could sit, stand, or walk the required time to perform the full range of sedentary work"); *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 433 (S.D.N.Y. 2010) ("The absence of medical evidence on the question of sitting capacity renders [the ALJ's] conclusion that [the

Plaintiff] can sit for six hours of an eight-hour day wholly unsupported by evidence") (adopting report and recommendation).

As noted, the ALJ conducted a thorough review of the evidence in the record in determining the plaintiff's RFC; however, because he did not assess the plaintiff's capacity to perform the "relevant functions" of sitting, standing, and lifting, I must remand the case to the Commissioner. *Cichoki*, 729 F.3d at 177. On remand, the Commissioner should develop the record on the subject of the plaintiff's capacity to do "light work"—specifically, his abilities to sit and stand, and to lift weight.

## CONCLUSION

For the reasons set forth above, I **DENY** the Commissioner's motion for judgment on the pleadings, (ECF No. 10), AND **GRANT** in part and **DENY** in part DiNapoli's cross-motion for judgment on the pleadings. (ECF 12.) This action is **REMANDED** for further administrative proceedings consistent with this opinion, and the Clerk of Court is respectfully directed to close this case.

**SO ORDERED.**

s/Ann M. Donnelly
_____

Ann M. Donnelly
United States District Judge

Dated: Brooklyn, New York
       March 24, 2016